UNITED STATES DISTRICT COURT SOUTH DAKOTA
RAPID CITY DIVISION

FILED
AUG 29 2017

Holli Telford personally and )
as assignee of the claims of )
Brenda Burton )

Civil No. 17- 5042

Plaintiffs )

Ron A. Bradeen, Bradeen )
Real Estate, Jeff Storm, Jim Bultsma
Jim Ashmore, Southern Hills Title )
Company, Morningside Properties LLP;
Heartland Real Estate; Verylis R. Boyd, )
Warner C. Boyd, Fall River County
Sheriff Robert Evans an SA Dane )
Rasmussen in their official capacities
)

Defendants

PLAINTIFF'S AMENDED OPPOSITION TO DEFENDANTS MORNINGSIDE, VERYLIS AND WARNER'S MOTION TO DISMISS AND CROSS MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS IN PLAINTIFF'S FAVOR

COMES NOW HOLLI TELFORD, to file this preliminary OPPOSITION to Defendants Morningside, Verylis Boyd and Warner Boyds motion to dismiss for failure to state a claim for which relief may be granted. Plaintiff hereinafter refers to the collective defendants herein as "the Morningside defendants".

The Morningside Defendants misrepresent that Plaintiff has failed to state a cause of action against them . . . "by failing to ancor any cause of action against the Morningside defendants to the wrongful acts alleged by Plaintiff." These representations are patently false.

Pages 1-7 of the Complaint allege the following cause of actions against the Morningside defendants. Violations of (1) the Interstate Land Sales Act, "ILSA"; (2) the accommodations provisions of the ADA; (3) The Retaliatory Provisions of the ADA and the FHA under 42 U.S.C. § 3617 and 42 U.S.C. § 12203, (4) Title 24 CFR § 100.7(a)(1) for failure to prevent third party discrimination; (6) Violation And Attempted Violation of RESPA, actionable under 12U.S.C. § 2607(b) and 24 C.F.R. § 3500.8(a); and for states causes of

1

action for (a) Breach of Covenant of Quiet Enjoyment, (b) The South Dakota Deceptive Trade Practices Act, SDLC 37-24-31, (c) Aid And Abet Conversion of Personal Properties; (d) Actual Fraud Pursuant to SDCL 53-4-5 and/or Constructive Fraud Pursuant to SDCL 53-4-6 and (e) Civil Conspiracy.

Contrary to the Morringside's contentions, Plaintiff has set out the relevant statutory provisions of her pled causes and various common law rulings pertaining to same, to support each of her causes of action and to show the necessary elements plaintiff must prove to obtain judgments on the alleged causes in her favor.

A cursory review of the Morningside defendants motion to dismiss shows that they are fraudulently attempting to absolve themselves from all liability based on non participation of any of the acts directly committed by Morningside's agents Ron Bradeen, Bradeen real estate, Jim Ashmore, Southern Hills, etc.

However, Morningside fails to acknowledge that Morningside is directly liable to Plaintiff based on the theory of vicarious liability as the real estate defendants and the title defendants were acting at the direct instruction and benefit of the Morningside defendants, their employer. Therefore the principle/agency doctrine applies to this action making the Morningside defendants directly and indirectly liable to plaintiff for the actions of their respective agents.

## I. Plaintiff has pleaded Sufficient Facts To Obtain Judgments in Her Favor On The Pleadings With Respect To the Liability of The Morningside Defendants

### A. Plaintiff Is Entitled To A Judgment On The Pleadings With Respect To Her ILSA Claim

The Complaint at pages 1-2 pleads the following elements to establish an ILSA "Interstate Land Sales Act" claim, Title 15 U.S. Code § 1701, et seq.

15 U.S. Code § 1703(a): Prohibits the following Activities:
(a) It shall be unlawful for any **developer or agent,** directly or indirectly, **to make use** of any means or **instruments... in interstate commerce,** or of the mails,
   (2) **with respect to the sale** or lease, or offer to sell or lease, **any lot...**
      (A) **to employ any device, scheme, or artifice to defraud;**
      (B) **to obtain money or property by means of any untrue statement** of a material fact, with respect to any information pertinent to the lot or subdivision;
      (C) **to engage in any** transaction, **practice,** or course of business **which** operates or **would operate as a fraud or deceit upon a**

2

purchaser.

Accordingly, Plaintiff must show (a) a developer or agent, (b) directly or indirectly, (c) made use of a means in interstate commerce, (d) to sell any lot (e)(i) by employing a scheme to defraud or (ii) by obtaining money or property by means of any untrue statement, or (ii) engaging in a practice that would operate as a fraud or deceit upon the purchaser.

The 8th Circuit in re **Streambend Properties v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003 (8th Cir. 2015)** has already concluded that failure to convey warranty deeds after surrender of the purchase price violates subsection (C)).

\* \* \* \* \* \*

The Complaint identifies the purchaser as Plaintiff, the Developers/owners [1] as the Morningside defendants and the Real Estate and Title Defendants as the agents of the Developers/owners. See Complaint @ pp. 1-2, 8-9.

The Complaint alleges that at the direction of the developers/owners, the agents directly conducted an absolute auction of 349.5 acres of land comprising of multiple lots. Plaintiff alleged that the tract of land that she purchased comprised of 9 lots. Complaint, pp. 8-9. para(s) 7-8.

The Complaint alleges that the absolute auction was conducted online across interstate lines ; thus identifying "the means used in interstate commerce." Complt p. 8.

The Complaint alleges that the defendants sold Plaintiff 9 lots and that Plaintiff tendered the full consideration for the lots, thus consummating the sale. Complaint pg. and, fn. 2. See 24 C.F.R.§ 1710.1 defining sale under the ILSA ("sale" is consumated when purchaser tenders consideration for the purchase, particularly during an absolute auction where the property is sold under conditions of no reserve; like in this case.)

The Complaint alleges that the defendants **employed a scheme to defraud** Plaintiff of title to the property and/or additional monies not authorized in the transaction, **made untrue statements** to procure money and property AND engaged transactions, practices, or course of business which **would operate as a fraud or deceit upon Plaintiff, the purchaser.**, to wit:

    (i)   As soon as the full purchase funds were paid in cash, a warranty deed and title policy was promised at the costs of the Seller; these items were never delivered. Complaint p. 8 ;

    (ii)  Appropriate and lawful closing fees were to be charged at no amount greater than $52 for the closing of a cash sale;

3

        The title defendants attempted to charge $600 for preparing a fraudulent settlement statement on a cash sale of $2350 and that required no other services from the title company, Complaint, pg. 9.

(iii) The agents refused to turn over the warranty deed to Plaintiff after Plaintiff tendered the full purchase fees and thus constituting a violation of subsection (C) in accordance with Streambend Properties, supra. Complaint pg. 12;

(iv) The Title Agents sought to extort unauthorized closing fees in the amount $600 for no additional services in violation of RESPA, 12 U.S.C. § 2607(b) providing: "No person shall give and no person shall accept . . . any charge made or received . . . other than for services actually performed". Preparing essentially a 1 page "form settlement statement" does not reasonably or customarily cost $600. Complaint 13;

(v) The agents prepared a HUD-1 Settlement form that is only used for Buyers obtaining a federally related mortgage loan, and further, which falsely represented that Plaintiffs were borrowing federal funds to mortgage the real estate; all in violation of 24 C.F.R. § 3500.8(a). This same form also **falsely represented that Plaintiff's full purchase funds was an earnest money deposit subject to forfeiture** if Plaintiff failed to sign the Settlement papers as prepared by the agents. Complaint pp. 11-13;

(vi) The defendants presented a defective warranty deed that purported to convey clouds on the title that were not covered under the title insurance policy, Complaint pp.11, 14;

(vii) The defendants failed to close the transaction on November 30, 2016 as promised and for no just cause other than to intentionally inflict further injury upon Plaintiffs; Complt p. 11

(viii) the Developers and their agents made promises they had no intention of keeping, employed a scheme and artifice to defraud Plaintiff's of their entire purchase funds; obtained money with respect to the sale based on untrue statements or omissions; and engaged in a course of business which operated as a fraud and deceit upon Plaintiff and Burton, the purchasers. Complt pp.10 -11.

(ix) The developers reported that Plaintiff and Burton were squatting on their purchased property -- to interfere with utility hook ups, irrespective that the sale had been consummated from the date that Plaintiff and Burton and tendered the full purchase funds on the realty subsequent to closing of the absolute auction. Complt p.15.

(x) After Plaintiff and Burton took possession of the property subject to paying the "no reserve" auction price for the land, the agents at the direction of the Developers/owners engaged in an illegal practice of vandalism, coercion, harassment, and threats of criminal prosecution if Plaintiff did not remove their residential trailer from the real property which was now powered by solar energy due to the defendants

interference with utilities access through false representation of squatting. Complaint p. 15.

Based on all of the foregoing, Plaintiff has established the elements for an ILSA claim against all defendants and liability of the defendants should by ordered by this court. Title 15 U.S. Code § 1709 (a) provides for the following civil remedies under the ILSA:

> A purchaser. . . may bring an action at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title. **In a suit authorized by this subsection, the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable.**

The Complaint shows that Plaintiff seeks relief for specific performance to turn over all title documents to plaintiff (complaint pp. 12, 16); seeks money damages from the defendants, Complt p. 15, and seeks such other relief as the court deems just and equitable. Complt p. 16. Plaintiff is entitled to a jury trial on the money damages; however this does not prevent this court from entering a judgment of liability against the Morningside Defendants to include an order for specific performance.

\* \* \* \* \* \* \*

To preclude this court from entering the requested relief and judgment, the Developers/ owners have asserted that because they did not participate directly in any of the complained of acts, that Plaintiff is not entitled to relief against the Monringside defendants.

Aside from the fact that the Developers directly interfered with Plaintiff's ability to access utilities to the subject land to make it seemingly impossible to reside thereon. The Monringside Defendants liability for the direct acts of their agents is taken under the doctrine of "vicarious liability" and therefore these defendants have no affirmative defense to Plaintiff's claims. In the real estate context, the following civil cases are instructive:

1. **Bradley v. Brabham Agency Inc., 463 F. Supp. 27 (D.S.C. 1978)**
The Bradleys sought to purchase a house in a specified subdivision. They contacted the Real estate agency posted on the front door of a house they wished to buy.

At the appointed hour Mr. Pate, the real estate agent, arrived at plaintiff's house. At the time he was driving an automobile, which belonged to him, but which had a Brabham Agency sign attached to the car advertising defendant's business. When Pate first arrived only Mrs. Bradley was present. Seeing that she was black, Pate advised her that her family would not be happy living at 2377 Tall Oak Road. Pate stated emphatically that he preferred not to show her the house and then suggested that they look at property in the Runnymede Subdivision, which is predominately black.

5

The plaintiffs had never before attempted to buy a house and were unfamiliar with the laws and customs regarding the purchase of real estate. That as a result of defendant's refusal to show plaintiffs the house because of their race, plaintiffs suffered embarrassment and humiliation and were denied the opportunity of purchasing the property.

Defendant real estate company, Brabham, contends that Pate acted as an independent contractor and therefore it is not responsible for Pate's actions; **this contention lacks support in either the facts or the law under the doctrine of "vicarious liability".** Although defendant may not have controlled Pate's day to day activities or directly supervised his methods of sale or contacts with prospective customers, **Pate did act on behalf of defendant, with defendant's consent, in the sale of real estate. Defendant would be vicariously liable under the law of agency if Pate was an agent of defendant and he was acting within his authority.** Though a person cannot be an independent contractor and a servant, he can be an independent contractor and an agent. Restatement, Agency 2d, § 14N states the rule as follows:

> One who contracts to act on behalf of another and is subject to the other's control . . . . is an agent even though her may also be an independent contractor.

The question thus becomes whether or not Pate's refusal to negotiate with plaintiffs was within his authority. If it was, then defendant is vicariously liable for the actions of Pate. Restatement, Agency 2d, § 7 provides the following definition of authority:

> Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.

In the case at bar, **Pate had express authority to enter into contractual relation-ships on behalf of defendant.** In fact, **that was the purpose of his employment by defendant.** Under well-settled principles of agency law, **a principal is liable to a third person upon a transaction conducted within the agent's authority.** See Restatement, Agency 2d, § 140. **As the agent of the defendant, PATE had authority to bind his principal.** The Fair Housing Act represents the situation in which there is, under the circumstances promulgated by the Act, **a duty to contract.** If the agent is acting pursuant to his authority to contract, which is clearly established here, and he refuses to contract because of the race of the other party or other discriminating factor, it must follow that the principal would therefore be liable just as if the agent had entered into a contract pursuant to his authority. The liability accrues to the principal in this situation, as in the situation where a contract is in fact made, from the exercise of the agent's authority to contract. **Thus defendant is liable in the present case for Pate's failure to meet his duty to contract or at least enter into the negotiations therefor.**

This conclusion conforms with the result reached by several other courts. In *United States v. Real Estate Development Corp.*, 347 F.Supp 776 (N.D.Miss.1972), the Court stated:

> The resident managers and managers of the defendants, as agents of the defendants, are authorized to represent the defendants and can rent in no

6

other capacity. Their acts and statements, made within the scope of their agency, are attributable to the defendants, **whose duty to comply with the law is non-delegable.** . . . [citations omitted]

See too *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1974), **the Court held the proprietor of a real estate agency liable for acts of his salesman** whether or not such person acted with the approval of the broker or at his direction **and where there was no evidence that the owner joined in any discriminatory acts.**

Finally, **defendant is liable for the actions of Pate under the principle of ratification.** The Defendant owner approved Pate's actions through communications with the enforcement agency, here the Shaw Air Force Base housing office. See Restatement, Agency 2d, § 82.

Since plaintiffs have proved by a preponderance of the evidence a violation of 42 U.S.C. § 3604, it is unnecessary to reach a conclusion under 42 U.S.C. § 1982. Because of this violation, plaintiffs are entitled to recover their damages. Damages in these cases have been broken down into three categories: direct economic loss, emotional distress, including humiliation and embarrassment, and loss of civil rights. The Court finds that plaintiffs have not proved any direct financial loss, but have proved emotional distress and loss of civil rights. Since defendant's owner and president ratified and approved the action of his salesman, the Court finds this to be evidence of willfulness and that an award of punitive damages in this case is also proper pursuant to 42 U.S.C. § 3612(c).

IT IS FURTHER ORDERED that the John M. Bradham Agency, Inc., its agents, servants, officers and employees be and they are hereby enjoined from any further violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. in the sale, rental or offering to sell or rent real property and shall not discriminate against any person or persons because of race, color, religion, sex, national origin or disability.

IT IS SO ORDERED.

### 2. Wilson v. Thorton, 2010 Mass. App. Div. 233 (2010)

In 2003, through Coldwell Banker, plaintiffs James H. and Denise M. Wilson **(the Wilsons) purchased a home** at 297 York Street in Stoughton **from the previous owners,** defendants Robert J. Thornton and **Renda I. Thornton** (Thorntons). **Renda Thornton was a real estate broker employed by Coldwell Banker,** and was obligated by the terms of her employment contract to use Coldwell Banker in the event she wished to sell her home. When that occurred, Renda Thornton was designated as the listing broker. **This appeal turns largely on the issue of whether, and under what circumstances, Coldwell Banker is liable for misrepresentations made by Renda Thornton in the Seller's Statement,** which she completed in her capacity as owner.

In the summer of 2003, **the well supplying water to 297 York Street and its swimming pool failed. All complaint counts were based on false responses Renda Thornton made in the Seller's Statement.** The jury later found that Renda Thornton's responses not only constituted both deceit and misrepresentation, but also caused the damages suffered by the Wilsons. Coldwell was found liable for unlawful business practices. **The court did not reach the issue of Coldwell's vicarious liability after finding Coldwell liable under the unlawful business practices act** given the duplicity of damages. We reverse

7

finding the judgment for unlawful business practices improper and remand for new trial on the vicarious liability claim.

**Generally, [a] principal is liable for the fraud committed by his agent or servant acting within the scope of his employment.** McCarthy v. Brockton Nat'l Bank, 314 Mass. 318, 325 (1943). **The principal cannot claim the advantages of the bad acts of its agent without assuming the imputation of their knowledge.** Id.

On the subject of the imputation of knowledge to a principal where the agent is reportedly acting adversely to the principal, Restatement (Second) of Agency § 282 (1958) provides:

> (2) The principal is affected by the knowledge of an agent who acts adversely to the principal:
>
> (b) **if the agent enters into negotiations within the scope of his powers** and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or
>
> (c) **if the principal knowingly retains a benefit through the act of the agent** which otherwise he would not have received. Id. § 282, at 611-612.

Where an agent of the corporation was acting within the scope of his employment when he learned of circumstances that might give rise to a claim against both him and [the corporation], id., **his knowledge is imputed to the corporation under ordinary agency principles.** Id. Finally, in his treatise on agency law, Professor Seavey stated:

> **A principal is liable for the many frauds of his agent,** although committed by the agent for his own purposes. The innocent principal is liable. . . because ultimately the principle must sign off on the transaction. W.A. Seavey, Agency § 102, at 185-186 (1964).

Plaintiffs did not prove direct fraud by Coldwell Banker under the deceptive trade practices act which requires direct acts of fraud, but Plaintiffs did set forth sufficient facts to hold Coldwell vicariously liable for its agent's established fraud under the doctrine of vicarious liability. Judgment reversed and case remanded for a new trial on the issue of vicarious liability. [1]

---

1. See too Bluehaven Funding, LLC v. First American Title Insurance Co., No. 09-2383 (8th Cir. 2010)

Under the doctrine of Vicarious Liability, "A principal is responsible for its agents' acts and agreements. Motorsport Mktg., Inc. v. Wiedmaier, Inc., 195 S.W.3d 492, 498 (Mo. Ct. App. 2006)

The clients are principals, and the attorney was an agent handling the title work. Under the law of agency, the principal is bound by his chosen agent's deeds. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976); Societe Internationale v. Rogers, 357 U.S. 197, 212, 2 L. Ed. 2d 1255, 78 S. Ct. 1087 (1958); Barnhill v. United States, 11 F.3d 1360 (7th Cir. 1993), slip op. 12. This is equally clear for negligent errors. Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 123 L. Ed. 2d 74, 113 S. Ct. 1489, 1499 (1993); Link v. Wabash R.R., 370 U.S. 626, 633-34, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962).

In the criminal context, engaging in an act of mortgage fraud would subject the defendant to liability under the doctrine of vicarious liability as well:

> See United States v. Moncrief, 133 Fed.Appx. 924 (5th Cir. 11/01/2004) :
> This appeal of the conviction of the appellant Joe Bob Moncrief involves what the government claims is the largest mortgage-loan-fraud operation ever to be prosecuted. Moncrief was a real estate agent and appraiser who over inflated the value of real estate properties to support the mortgage fraud scheme controlled by the Mei family, owners of several real estate companies and whom put the mortgage fraud schemes into action. Essentially Montcrief argued that because he did not receive any of the excess monies from the mortgage companies secured against the over valued properties, that he could not be convicted for fraud related to the scheme.
> Montgrief was convicted under a conspiracy theory of vicarious liability. "It is well-settled that **a conspirator may be held criminally culpable for the substantive offenses committed in the course of the** conspiracy of which he is a member, **even if committed by other members of the conspiracy.** See United States v. Basey 816 F.2d 980, 997 (5th Cir. 1987); Pinkerton v. United States ,328 U.S. 640, 646-47 (1946). The evidence is sufficient to support the jury's verdict finding that Moncrief was a member of the conspiracy at all times relevant to the indictment. Moncrief provided the appraisals at infalted prices and which the Mei family used to submit to the mortgage companies to obtain inflated loans. Accordingly, since Moncrief was acting in an agency capacity for the Mei family, **vicarious liability supports the jury verdict finding Moncrief guilty of all the substantive offenses.**

In this action, the Morningside defendants will not be able to escape liability for the fraudulent acts of it's agents because knowledge is imputed to the Morningside defendants under the theory of agency. In addition, the Morningside defendants were required to sign

---

See too Smith v. Dorchester Real Estate, Inc., 11-2349, 11-2378, 11-2389 (1st Cir.2013)
Held: "[C]onduct of an **agent is within the scope of employment if it is of the kind he is employed to perform and if it is motivated, at least in part, by a purpose to serve the employer.** "Wang Labs., Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1166 (Mass. 1986) (internal citations omitted). Here, Bertucci's acts as the closing agent were within the purview of his job and both closings took place at the RKelley-Law office during regular business hours. Further Bertucci's participation in the fraudulent closings was motivated by a desire to serve RKelley-Law's interests in conducting real estate closings. **Because the jury found Bertucci liable for fraud, and because there was evidence that Bertucci acted within the scope of his employment,** we find it as error that the lawfirm was not also found liable for fraud under the doctrine of vicarious liability and remand the issue of vicarious liability back to the district court for a trial on this cause. Alar, 208 Mich.App. At 528 See also Krasny-Kaplan Corp. v. Flo-Tork, Inc. (1993), 66 Ohio St.3d 75, 78. ("Indemnification is a right which arises within the context of a relationship wherein one party is found to be vicariously liable for the acts of a tortfeasor.).

9

the warranty deed, when no sign off took place, the Morningside defendants ratified the illegal conduct of it's agents. Last but not least, ratification can be found in interfering with Plaintiff's rights to utilities to the property.

### B. Plaintiff Is Entitled To A Judgment On The Pleadings With Respect To Her ADA And FHA For Denial Of Housing Related Services And For Claims For Intimidation, Retaliation And Coercion Against The Morningside Defendants

#### 1. The Morningside Defendants Interferred With Plaintiff's Rights to Utility Services In Violation of the FHA

In SINISGALLO V. TOWN OF ISLIP HOUS. AUTH. 865 F.Supp.2d 307 (E.D.N.Y. 2012), the federal court held that **ADA and FHA claims were required to be analyzed together** when based on the same set of facts citing Sombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 573 & n. 4 (2d Cir.2003); Bryant Woods Inn, Inc. v. Howard County, 124 F.3d 597,603 (4th Cir.1997); Siefken v. Vill. of Arlington Heights, 65 F.3d 664, 666 n. 1 (7th Cir.1995)); Blatch ex rel. Clay v. Hernandez, 360 F.Supp.2d 595, 630 (S.D.N.Y.2005) ("Standards for discrimination against the disabled are interpreted similarly under the ADA, and FHAA.").

**Title 42 USC § 3604 provides** that:

it shall be unlawful. . .

(f) (2) : To discriminate against any person . . .in the provision of services or facilities in connection with such dwelling, because of a handicap of— (B) person residing in or intending to reside in that dwelling.

24 C.F.R. §100 et seq. (1992) provides for similar prohibitions in interferring with utilities to a protected property :

any conduct relating to the provision of. . .services and facilities in connection [with housing] that otherwise makes unavailable or denies a dwelling to persons . . . is a discriminatory act under the FHA.

In COOKE v. TOWN OF COLORADO CITY, ARIZ., | 934 F.Supp.2d 1097 (2013), the federal court held that for Plaintiff to prove a prima facie claim of discrimination under the Fair Housing Act as applied to utility services, Plaintiff must establish that:

(1) the Cooke Plaintffs were members of a protected class, (2) the Cooke Plaintiffs applied for water, electricity, and sewer and other utility services and **were qualified to receive them,** (3) the utility services were denied despite the fact that the Cooke Plaintiffs were qualifed to receive them, and (4) other persons were approved like services in the same geographical area. Budnick

v. Town of Carefree, 518 F.3d 1109, 1114 (9th Cir.2008).

The COOKE court entered money judgments in favor of the COOKES and a 10 year injunction against future discrimination against the Cookes.

See too **HUD v. Huntsville utilities, HUD CASE NUMBER: 00-12-0006-8 (2012)** :

> Held: 24 C.F.R. § l00.50(b)(3) states that: "it shall be unlawful to...engage in any conduct relating to the provision of housing which otherwise makes unavailable or denies dwellings to persons. 24 C.F.R. § 100.70(b) states that: "it shall be unlawful, . . . to **engage in any conduct relating to the provision of housing or of services or facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons.**" Section 818 of the Act makes it unlawful for any person "...to interfere with any person in the exercise or enjoyment of...any right granted or protected by section 804...of this title." HUD's implementing regulation at **24 C.F.R. Part 100, § 100.400(c)(2) prohibits "...interfering with any person in his or her enjoyment of a dwelling to a denial of services related to housing.** This section also applies to 42 USC § 3617. Here Huntsville Utilties violated the FHA by denying full utility services to include water and electricity to race protected households under the act. Huntsville Utilities entered into a conciliation agreement with HUD to commit no further violations under this act.
> Accord in Chase Barfield, et al., v. Sho-Me Power Electric Cooperative, et al., (U.S.D.C. Western District of Missouri, 2:11-cv-4321NKL).

See also Campos v. Barney, 8:06-cv-00699 (D. Ne. 2007)(**Depriving park tenants of water on two occasions and of trash facilities** states section 3617 claim); *Ohana v. 180 Prospect Place Realty Corp.*, 996 F.Supp. 238 *(E.D.N.Y.1998)*(redirecting Complainant to other neighborhoods states a section 3617claim.). **Boulder Meadows v. Saville, 2 P.3d 131, (Colo.App.2000). FF. 8, 17** (instructing protected occupant **to sell or move her mobile home from the park** was an absolute prohibition against her use and enjoyment of her home in violation of 3617. A rule which has the effect of precluding handicapped individuals from residing in the residence [of their choice] was precisely the type of conduct which the Fair Housing Amendments Act sought to overcome with the enactment of § 3604(f)(3)(B)."); United States v. Village of Marshall, Wisconsin, 787F.Supp. 872, 879 (W.D. Wis. 1991)).

* * * * * * * *

Under the foregoing authorities, Plaintiff only need establish the following 4 elements: (1) Plaintiff was a member of a protected class, (2) Plaintiff applied for utility services and were qualified to receive them, (3) the utility services were denied despite the fact that the that Plaintiff was qualified to receive them, and (4) other persons were approved like services in the same geographical area.

11

In this action, the Morningside defendants do not deny that they instructed local utility providers to not provide Plaintiff with any utility services to the property in order to make a claim that plaintiff were illegally squatting on the property. Complaint p. 15. The Plaintiff had performed all that was required of her to obtain title and possession of the property. The denial of housing services in the form of utilities constituted a violation of the act as set forth supra under the common law rules of various courts reaching the same federal question. Moreover, the fact that Plaintiff began utilizing solar services does not aid the Morningside defendants because solar electricity does not work during the evening hours. . . so Plaintiff was in fact restricted from enjoying her housing rights. Nevertheless, Plaintiff has met all of the elements for meeting her FHA and ADA claims against the Morningside defendants, to wit:

(1) Plaintiff was a member of a protected class as she has been declared as disabled by the SSA and the FHA provides plaintiff specific protection under the act. Complaint p. 8. See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) (persons declared as disabled by the SSA establish their disability status within the meaning of the ADA, 42 U.S.C. 12102 and the FHA, 42 USC section 3604(1)(3)).

(2) Plaintiff applied for utility services and were qualified to receive them. Plaintiff has excellent credit and qualified to receive past utility services in other states. Complaint p. 15.

(3) Plaintiff's application for utility services were denied despite the fact that the that Plaintiff was qualified to receive them, because the Morningside defendants reported that Plaintiff was illegally squatting on the property; Complaint p. 15.

(4) other persons were approved like services in the same geographical area.

## 2. The Morningside Defendants Retaliated Against Plaintiff In Violation of 42 U.S.C. § 3617 and 42 U.S.C. § 12203

To prove a retaliation, coercion and interference claim under these two statutes, the federal court have decisioned that Plaintiff must utilize the McDonnell Douglas analysis applicable to other retaliation claims and prove the following elements: (1) she was engaged in protected activity; (2) defendant subjected her to an adverse action; and (3) a causal link exists between the protected activity and the adverse action. See, e.g., *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001).

The following federal courts have decisioned that the following conduct will constitute retaliation under the FHA and ADA: *Johnson v. Smith, 810 F* Supp. 235, 238-39

(N.D. Ill. 1992) (**Repeated acts of vandalism** state a 3617 claim); Arnal v. Aspen View Condominium Association, Inc, et al. no. 1:15-cv-01044- WYD (2016)(penalizing person with criminal or civil sanctions as a result of protecting housing rights under the FHA and ADA states a 3617 claim.); Filshtein v. West Hartford Housing Authority, CHRO NO. 0050061 (CT, 2001) (Directing Plaintiff to move or else plaintiff would be subjected to administrative sanctions in losing his section 8 benefits, stated coercion claim).

* * * * * *

It is undisputed that Plaintiff complained to local authorities Evans and Rasmussen that the real estate defendants and the Owners has stolen Plaintiffs purchase funds for the subject real property and interfered with Plaintiff's entitlement to utilities. Complaint p. 14-15.

RASMUSSEN contacted the Morningside Defendants to investigate into Plaintiff's claims and Verylis Boyd claimed that Plaintiff was squatting on the property. Complaint p. 14.

As a result of Verylis Boyd's false report, RASMUSSEN threatened to prosecute Plaintiff for felony conduct of false fictitious address under 18 USC section 1342 or the state equivalent. Complaint p. 15.

Defendant BRADEEN than acted on that threat by procuring Evans and Rasmussen to remove Plaintiff from the property on criminal trespassing grounds and posted notices on Plaintiffs trailer to this effect as well as sending Plaintiff email notices to this effect. Complaint p. 15. The posting of notices with industrial grade tape across Plaintiff's trailer doors caused vandalism against Plaintiff's properties when Plaintiff attempted to remove the industrial tape.

With the foregoing facts in mind, Plaintiff claims to have met the elements to state retaliation claims against the Morningside Defendants and the real estate defendants.

First, Plaintiff was engaged in protected activity when she complained to policing authorities about the defendants fraud and theft activities. Second, the defendants subjected to Plaintiff to adverse action by defrauding local authorities into believing that Plaintiff and Burton were squatting on the subject real property without color of right to that property and therefore the policing authorities should commence criminal proceedings against Plaintiffs for false fictitious address and criminal trespassing. Third, a direct causal link existed between Plaintiff's protected activity and the adverse action of threatening Plaintiff with criminal prosecutions. See *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th

13

Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action, by itself, establishes causation.")

Having met the foregoing elements for discriminatory housing services as committed by the Morningside defendants, Plaintiffs is entitled to a liability judgment on her complaint in her favor for her 2nd and 3rd claims for violations of the ADA and the FHA, and further, is entitled to a jury deciding her money damages.

### C. Plaintiff Is Entitled To A Judgment On The Pleadings With Respect To Her Breach of Covenant of Quiet Enjoyment Claim Against the Morningside Defendants

In Clark v. United States, No. C8597TB (660 F. Supp. 1164) (W.D. Wash. April 20, 1987), a federal court held that a defendant will be liable for the tort of breach of Quiet Enjoyment if the defendant's actions disrupt the use of Plaintiff's property in any manner and cause Plaintiff any emotional and mental distress.

There is no dispute that the defendants actions caused Plaintiff emotional distress and disrupted use of the property. Plaintiff therefore is entitled to a liability judgment against the Morningside Defendants for Breach of the Covenant of Quiet Enjoyment.

### II. The Vexatious Litigant Orders Are Void Ab Initio As Pleaded Before Judge Lange's Court Without Contest; Plaintiff Is Entitled to Attack These Judgments as VOID Before This Court Given the Defendants Are Relying On Those Void Judgments As Grounds For Sanctions In This Court

The defendants cite to the vexatious litigants orders presented to Judge Lange's court as a basis for obstructing Plaintiff's claims in this action. However, they fail to inform this court, that Plaintiff challenged the vexatious litigants order before Judge Lange's court as void ab initio AND that Plaintiff's legitimacy challenges went wholly uncontested by every single defendant in that action. Judge Lange refused to exercise his inherent powers to decree each judgment void ab inition because he declined to exercise jurisdiction over the federal questions presented to his court.

Since the defendants are now using the void contempt judgments in this court to obstruct Plaintiffs claims heretofore, Plaintiff is entitled to attack the legitimacy of each of these void judgments UNDER SEPARATE COVER so that Plaintiff receives adequate

14

briefing rights to address each of these void judgments, especially knowing this court's strict adherence to the 25 page limitation rule on individual filings made in this court to include supporting exhibits. Plaintiff will complete this briefing as soon as she is able.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Opposes the Morningside defendants motion to dismiss and seeks cross judgments on her complaint for her claims stated against the Morningside defendants as briefed in this petition.

Plaintiff also notices the court of her intent to file under separate cover attacks of the orders entered against her and to request exercise of this court's inherent duties to decree each of those orders as void ab initio.

Dated: _____

Hollie Telford

Certificate of Service

HOLLI certifies that that courts ECF filing system will serve this document on the parties..

15